In the Matter of CLDC MANAGEMENT
CORPORATION, Debtor,

Appeal of Irene M. GESCHKE
and Clarence O. Geschke.

No. 94–3586.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 6, 1995.

Decided Jan. 5, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied Feb. 15, 1996.

Paul H. Strecker, Chicago, IL, for Russell R. Custer.

Irene M. Geschke (argued), Woodstock, IL, pro se.

Clarence O. Geschke, Woodstock, IL, pro se.

Stephen B. Diamond (argued), James Shedden, Heidi Joanne Walter, Beeler, Schad & Diamond, Chicago, IL, for LaSalle Nat. Bancorp.

Before POSNER, Chief Judge, and H. WOOD, Jr. and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

The underlying facts in this dispute began to emerge during the administration of President Ford in 1976. The lawsuit was filed during the Carter administration in 1979. Discovery consumed the two terms of the Reagan administration. During the Bush administration, the district court granted a defense motion for summary judgment which we reversed less than a year before the start of the Clinton administration. The case was finally tried to a jury for about two weeks in 1994, and it is here now, for the second time, ready for our review. Our decision today will, we hope, put the case to rest before the next administration takes office in Washington.

During its visit here, in 1992, we noted that the case "had a confused and complex procedural history." We also noted that the Geschkes "have been litigating [the case] on a *pro se* basis since July 1988, when their previous counsel withdrew." We told the Geschkes in 1992 that this case was complex, noting that it "involved a search of numerous records, a task ill-suited to litigants with no legal background."

In 1992, Irene Geschke (who successfully argued the summary judgment decision) told us she and her husband had tried to find counsel to represent their interests on a contingent fee basis—she said they talked with 28 different law firms—but to no avail. We closed our 1992 decision by noting, "It appears to the court that the appellants would be well advised to continue their efforts to secure legal counsel."

The Geschkes did not engage a lawyer to represent them after we sent the case back to the district court in 1992. During the 1994 trial, Irene Geschke functioned, so to speak, as lead counsel. Now that the jury has not seen the case the Geschkes' way, they are back here again on appeal, with Irene orally arguing the Geschke position. We asked, during argument, if she tried to engage counsel prior to the trial, and she said yes, but that the attempts were unsuccessful.

With examples like Patrick Henry, John Marshall, and Abraham Lincoln, we know that one does not, necessarily, have to go to law school to be a good lawyer. But it helps. Although we believe the Geschkes, particularly Irene, have done a fine job presenting this case, the primary shortcoming here is that they have not received sage and unemotional advice about the merits of their case by someone not directly embroiled in the proceedings. One of the real dangers in representing yourself is that you sometimes get to believe that your case is better than it actually is. That appears to be the situation here. That the Geschkes think their case is stronger than it is may be seen in their attempts to obtain counsel prior to the first appeal. We know, and we hope the Geschkes know, that attorneys are generally more than willing to take up cases on a contingent fee basis if they have a fair chance of winning. When 28 lawyers turn a case down, that should be an indication that it is swimming upstream. Either all the lawyers who reviewed the case and found it unworthy of acceptance are wrong, or the Geschkes are wrong in believing that the case has worth.

The bookmakers in Las Vegas would know whom to put their money on in this disagreement.

So we are now poised to issue a decision on the Geschkes' appeal, and because the jury found in favor of the defendants, we are required to view the facts in the light most favorable to them. The facts that we will report, then, may not necessarily be what the Geschkes view the facts to be, but that is one of the rules we are obligated to follow in a case that reaches us in this posture. And so we turn now to a review of the facts, going, perhaps, into more detail than we would if the Geschkes were represented by counsel.

In 1976 the Geschkes decided to build a racquetball club in Woodstock, Illinois. They developed plans for the project and reviewed them with two architects before hiring one of them to take charge of the project. They also retained a certified public accountant to conduct a feasibility study of the plan.

After their initial spadework, the Geschkes began to look for financing. They discussed the costs of construction and financing with two banks, then met with Dennis Kaplan, a mortgage loan representative employed by Union Realty Mortgage Co., Inc. Kaplan reviewed the Geschkes' projections of cash flow from the project to determine what sort of mortgage could be issued. Based on this review, Kaplan determined the property would support a debt of $350,000, and the Geschkes applied for a construction loan with Union in that amount plus an additional $25,000.

One month after they submitted the loan application, the Geschkes received a written estimate from their architect that it would cost $489,000 to build the club, $114,000 more than the requested $375,000 loan. A few days after the Geschkes received the architect's cost estimate, they entered into a contract with him to prepare construction drawings.

Union conducted an appraisal while it processed the Geschke loan application. Union's appraiser estimated that it would cost $478,000 to build the club, a sum close to the estimate provided by the Geschkes' architect. Relying on personal financial statements submitted by the Geschkes which showed their net worth to be $1 million, Union agreed to make the $375,000 loan.

The loan commitment was issued by Russell Custer, an officer of Union. Custer made a preliminary commitment for the loan in February 1977, followed by a more comprehensive commitment in May 1977. The loan agreement was ultimately executed in July of 1977. The agreement noted that the loan would only "defray a portion of the cost of constructing" the club. As conditions of the loan commitment, the Geschkes were required to complete construction by December 1, 1977, keep the property free of mechanic's liens, and provide satisfactory evidence that the cost of construction had been paid to the extent that the proceeds of the construction loan would be sufficient to pay for the completion of the project.

Just as they have acted as their own counsel for much of this case, the Geschkes chose to act as their own general contractor on the job. They did, however, decide to hire a supervisor to work under their direction. The Geschkes interviewed several possible candidates for the construction supervisor post, including their architect. Ultimately, they hired Jack Organ, whom they met earlier through Mr. Kaplan. Organ's capabilities were known to Union because he had successfully completed other construction projects which Union had financed. Custer and Kaplan thought Organ was competent based on their observations of his work for others and the work he did for Union.

As a condition of the racquetball club loan, payouts would not begin until the Geschkes submitted a sworn contractor's statement itemizing the cost of the project. Irene Geschke submitted a sworn contractor's statement to Union (why it was accepted from a noncontractor is not clear and not important) on October 12, 1977. The statement, signed by Irene Geschke, showed costs to be $453,000. Payouts began a few days after Union received the sworn statement.

Meanwhile, the foundation for the racquetball club had been poured during the spring and summer of 1977, after which the work was stopped due to a delay in the delivery of precast concrete panels to be used for the

construction of the club. In August the Geschkes—who then had a lawyer—wrote the precast supplier threatening to terminate the contract and file suit if it did not immediately deliver the panels.

Because of the delays in the precast panel deliveries, the Geschkes did not complete the project by December 1, 1977, the deadline called for in their agreement with Union. From December 1977 through June 1978, the Geschkes attempted to devise a plan to complete the project, but they never submitted one to Union. Subcontractors began placing mechanic's liens on the property and, after a substantial percentage of the loan had been disbursed, Irene Geschke told Union the loan was "out of balance," meaning that the undisbursed funds were not going to be sufficient to pay the remaining costs of construction. In June 1978, Union filed a foreclosure action against the racquetball club complaining that the Geschkes were in violation of the loan agreement.

Shortly after Union filed the foreclosure suit, Mrs. Geschke found a purchaser for the project, Richard Izdebski, the owner of CLDC Management Company. In her opening statement during the 1994 trial, Mrs. Geschke told the jury that she would prove that Izdebski was a business partner with the president of Union, Fred Gale, and that the foreclosure suit was part of a conspiracy among Union, Gale, and Izdebski to transfer the property to Izdebski. But the evidence subsequently presented, and as we view it today, could instead show that Mrs. Geschke herself found Izdebski, who did not have a business connection with Gale. More on this later.

When the purchase by CLDC Management was completed, Union dismissed the foreclosure action and released the Geschkes from their $375,000 personal guarantee on the construction loan. Union made a substitute loan for $375,000 and loaned an additional $144,000 to Izdebski and CLDC Management to complete construction, which they did. The club opened, but apparently there was a shortage of racquetball players in Woodstock, as it soon sank into bankruptcy. Union, which was never repaid, lost a significant sum of money on the project.

When this lawsuit began in 1979, the complaint sought damages only for the Geschkes' racquetball club project. Once the suit was filed, the parties plunged into the sea of discovery from which they eventually emerged in 1988. In 1989, despite the fact discovery was closed, the Geschkes, by then proceeding *pro se,* sought additional documents from Union and sought to expand the suit to include a claim for losses stemming from two other projects that went south over a decade earlier. A magistrate judge held that Union had complied with the document production requests and that the Geschkes' previous counsel was satisfied with discovery. He concluded that the Geschkes were bound by counsel's decision and that discovery would remain closed. The request to add the other failed projects to the case was also rebuffed.

Later in 1989, the Geschkes asked leave to amend their complaint to add LaSalle National Bancorp, Inc. as a defendant on an alter-ego theory. The claim was that Bancorp was the alter ego of Union, which went out of business in the early 1980's because it was losing money. Leave to bring Bancorp into the case was granted when the Geschkes stated that its inclusion would not require additional discovery.

Cross-motions for summary judgment on the alter ego count were filed in July 1990. The district court granted Bancorp's summary judgment motion, concluding "that there are no disputed facts which, if resolved in favor of the [Geschkes], would justify piercing the corporate veil [and] holding Bancorp liable for any obligations of Union that may exist toward the [Geschkes]." The Geschkes moved for reconsideration, alleging for the first time that they were denied access to documents necessary to defeat the motion for summary judgment. They served Union and Bancorp with a 43–category document request. Union and Bancorp filed a response with the court. The district court permitted the Geschkes to review additional documents but subsequently denied the Geschkes' motion for reconsideration.

We reversed the grant of summary judgment and directed the district court to clarify

its position on discovery issues. The Geschkes then filed a new 53–category document request directed to Union and Bancorp, which they styled as a "Rule 37(a) motion to compel." Bancorp and Union filed a written response to the Geschkes' document request. To ensure that the Geschkes received all the discovery they sought after the remand, the district court ordered Bancorp to produce "anything that is arguably relevant." The district court even ordered production of documents produced before, so that no complaint could be made by the Geschkes that information was withheld.

Bancorp subsequently produced more than 100,000 pages of documents. After reviewing the documents for only one day, the Geschkes filed a Rule 37(b) motion for a default judgment against Bancorp, claiming that none of the requested documents had been produced. Judge John Grady, who we note was handling this case with exemplary patience in the district court, denied the Rule 37(b) motion as premature, pending review of all the documents. The Geschkes refused, however, to further review the documents despite three statements by Judge Grady during a hearing on October 21, 1992, where he said:

I am also ordering you to look at the documents that have been provided to you by the defendants.

. . . .

Mrs. Geschke, I have told you repeatedly that I will not try this case and allow you to argue on appeal that I have denied you or that the defendants have denied you relevant information.

. . . .

I think that the Appeals Court would probably find it an abuse of discretion for me to take this case to trial without having ascertained that their mandate of full document production has been complied with.

The Geschkes, apparently reluctantly, reviewed the documents and then filed another Rule 37(b) motion alleging nonproduction. They again sought a default judgment against Bancorp. In April 1993, the district court issued an order setting a hearing on the motion. The Geschkes objected to any hearing being held and filed a mandamus petition asking us to decide the Rule 37(b) motion. We denied relief on May 13, 1993. We denied the Geschkes' request for reconsideration on June 30, 1993.

At the hearing, Judge Grady accepted a defense suggestion that the focus be on five major categories of documents identified in our opinion reversing the grant of summary judgment. The district court also invited the Geschkes to select five additional categories of documents which supported their claims of discovery abuse. The Geschkes refused to participate, so the court randomly picked five categories to join the five previously selected.

The district court then held a 3–day evidentiary hearing to resolve the Geschkes' motion. The hearing produced a transcript that is 300 pages long. The district court examined the documents produced in the various categories and heard testimony from several witnesses, including Mrs. Geschke.

At the conclusion of the hearing, Judge Grady determined that Bancorp and Union had complied with the discovery requests or made good-faith objections and that Irene Geschke, who testified during the hearing, was not a credible witness. The district court stated that it was satisfied that all documents had been produced and that as to any other documents, the Geschkes' "mere suspicions that they must exist somewhere is not a sufficient predicate for sanctions." The court added that the motion was frivolous and that it had taken more time to resolve than it takes to try most cases on the merits.

Perhaps not surprisingly, the Geschkes were unhappy with Judge Grady's decision. They showed their unhappiness by filing a motion to remove him from the case. Although one would understand the temptation here to grant such a motion and pass the case to someone else—as the queen of spades is passed in a game of Hearts—Judge Grady, to his credit, denied the motion. We affirmed his decision on November 8, 1993, when the Geschkes sought a writ of mandamus in this court. And so the case was ready to move into the on-deck circle.

Judge Grady, very patiently we think, next conducted a three-day pretrial hearing to review all trial exhibits. The purpose of the

hearing was to ensure an orderly presentation of evidence, to make the trial understandable to the jury, and to assist the Geschkes, as *pro se* litigants, in presenting their case. The court reviewed and ruled on the admissibility of each of the Geschkes' proposed 290 exhibits. In ruling on admissibility, Judge Grady focused on excluding irrelevant, cumulative, and nonauthenticated evidence. He determined that 148 of the Geschkes' exhibits would be admissible during the trial.

Lastly, Judge Grady bifurcated the liability phase of the trial, with the liability of Union and the individuals to be tried first. If Union was liable, the trial would then focus on the alter-ego claim against Bancorp.

After the pretrial hearing, the stage was set for the trial. To summarize the proceedings, the Geschkes were, or should have been, poised to prove their claim that Union, Kaplan, and Custer conspired to underfinance the construction of the racquetball club so that Union could obtain ownership of the property through foreclosure. Mr. Organ (since deceased), who we noted earlier was the Geschkes' construction supervisor, was also along for the ride, as was James Campion, the trustee for the mechanic's lienholders on the project. The asserted claims covered the gambit from misrepresentation to RICO violations to breaches of fiduciary duty and contract.

The trial, which started on August 15, 1994, didn't go too smoothly as Irene got off on the wrong foot by violating a court order to refrain from mentioning Union's lack of assets. She let the cat out of the bag on that one during her opening statement. Later in the trial, Mrs. Geschke—who testified for three days—disregarded, several times, Judge Grady's orders and put collateral and inflammatory matters before the jury. This earned her a citation for contempt of court.

Eventually the case was submitted to the jury, and it exonerated Union, Custer, and Kaplan on all counts. Campion, the trustee, was excused earlier on a motion to dismiss. Mr. Organ, the jury said, did not participate in a scheme to defraud the Geschkes, but he did make two misrepresentations, neither of which, however, were made as an agent of Union.

The Geschkes raise a smorgasbord of complaints about the trial. Before even getting to their argument, they raise 44 separate objections, including (using their own words) things like:

- Court Issues Contradictory Rulings Concerning Admission Of Evidence
- Court Excludes Evidence Concerning Defendants' Failure To Comply With Its Order To Produce Documents Requested By The Geschkes
- Opposing Counsel Misrepresents That Contractor's Statement Had Been Previously Furnished to Geschkes and Admitted Into Evidence
- Court Excludes Geschkes' Charts To Which Defendants Objected, But Reserves Ruling on Geschkes' Objections To Bancorp's Charts

The Geschkes' appeal is a bit amorphous, but as best we can ascertain, their objections fall into three categories. First, they argue that Judge Grady should have concluded that the defendants failed to produce properly subpoenaed documents. Secondly, they challenge a number of trial court rulings which excluded certain, largely unspecified, evidence. Last, they complain about the jury instructions and the special verdict form employed by Judge Grady to present the case to the jury.

Our review of the record leads us to find, without any difficulty, that Judge Grady bent over backwards to assure that the Geschkes had the relevant documents they needed to present their case. The problem, it seems to us, is that the Geschkes did not really have a handle on what was material and what was immaterial in presenting this case to the jury. Because we review findings like the ones that Judge Grady made regarding the production of documents on an abuse-of-discretion standard, we find against the Geschkes on this point. Furthermore, the Geschkes acknowledge, at page 7 of their brief, that more than 136,000 documents in 87 boxes were produced by the defendants. Given this situation, and considering the great lengths Judge Grady went

through to ensure that the Geschkes got what they were entitled to, we find no error.

■■■ As with the district court's ruling on the Rule 37 matters, we review its rulings on the admissibility of evidence for an abuse of discretion. *Walsh v. Emergency One, Inc.,* 26 F.3d 1417, 1420 (7th Cir.1994). No error may be predicated on the exclusion of evidence unless a substantial right of a party is affected. *See* 28 U.S.C. § 2111, F.R.E. 103(a), and Fed.R.Civ.P. 61.

The Geschkes' brief does not clearly articulate how the district court erred in its rulings on the proposed exhibits that were barred during the 3–day hearing prior to the start of the trial. The Geschkes refer to a mass of exhibits and claim prejudice due to their exclusion, but their brief is silent regarding specifics as to what exhibits were excluded—and why they were relevant. It is next to impossible to put our fingers on just what rulings were wrong and why. We asked Mrs. Geschke during her oral argument to give us a hint, but she wouldn't do it.

Despite the waiver, considering the Geschkes' *pro se* status, we have combed the record looking for error in excluding evidence. Given the trial court's discretion and, in this case, its obligation to keep the case focused, we find no error that would cause us to undo what occurred in the trial.

Perhaps representative of the frivolousness of the Geschkes' arguments on appeal is the issue they raise regarding Mr. Organ's past. The Geschkes, over a vigorous defense objection, were permitted to put into evidence an old criminal conviction lodged against Mr. Organ. He had been convicted of forgery during the Eisenhower administration in 1958, and apparently he had another conviction for theft. Although the defendants argued that the matters should have been excluded under Rules 404(b) and 609 of the Federal Rules of Evidence, Judge Grady let the jury hear it. Also, the jury heard that Union's officers suggested Organ as a construction supervisor for the job knowing that he had been convicted of a crime years ago. In explanation, Custer and Kaplan testified that Organ's trouble with the law occurred before they met him, that they did not know the details of the matters, and that

they only learned of it after he started doing work for Union. Because his work was excellent, they said, they would have been embarrassed to ask him about his distant criminal past.

Second, although the Geschkes complain that the court did not admit an exhibit they described as Organ's criminal record, the district court, in fact, admitted a certified statement of Organ's conviction. It did not admit other documents included in the Geschkes' proffered exhibit—a police arrest record and the indictment against Organ.

Finally, because the jury found against Organ by concluding that he made two misrepresentations, the Geschkes suffered no prejudice due to any limitation on the evidence of Organ's criminal record. Nor did they suffer any prejudice in their claims against Union or Bancorp. None of that evidence related to their claim that Organ was Union's agent. Moreover, the jury was fairly and appropriately instructed on the issue of whether Organ was Union's agent with regard to the various claims. The jury rejected the Geschkes' assertion that Organ was Union's agent, and we, under the facts of this case, honor that finding.

■■■ We turn last to the objections to the jury instructions and special verdict forms. We shall not tarry in dispatching both sets of objections. A trial court has wide discretion in submitting special verdicts to the jury in order to facilitate its comprehension of the issues. *United States v. $94,-000 in U.S. Currency,* 2 F.3d 778, 790 (7th Cir.1993). The submission of inadequate jury instructions requires reversal only if "it appears that the jury's comprehension of the issues was so misguided that one of the parties was prejudiced." *Walsh v. Emergency One, Inc.,* 26 F.3d 1417, 1420 (7th Cir. 1994).

■■■ The district court's use of the special verdict it fashioned here was a proper exercise of its discretion under Federal Rule of Civil Procedure 49(a) because the case involved a multi-count complaint with significant overlap among the counts, the various

legal theories, and the facts relevant to those counts and theories.

■ Though their argument is not quite as clear as mud, the Geschkes apparently challenge the verdict and instructions because they excluded "issues of fact." This appears to relate to the Geschkes' claim that the jury was somehow not sufficiently instructed on their scheme-to-defraud theory. This argument is without merit because the district court clearly used the Geschkes' complaint as a basis for framing the issues presented to the jury.

We have reviewed the verdict form and the instructions and find that they not only are not erroneous, but rather, affirmatively, that they were correct. The instructions and the verdict gave the jury a fair opportunity to view the case one of two ways. Either the defendants conspired to underfinance the racquetball club project so they could seize it in foreclosure, or they did not. The Geschkes had a fair opportunity to present their case to a jury of their peers. The jury rejected their claims against the defendants here, and we think the evidence was more than sufficient to support that finding. Accordingly, the judgment of the district court is affirmed.